NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReportersjc.state.ma.us

17-P-814                                        Appeals Court
17-P-968


BRIAN BUTLER  vs.  THOMAS A. TURCO & others[1]
(and a companion case[2]).


Nos. 17-P-814 & 17-P-968.

Worcester.      Suffolk.      February 5, 2018. - March 30, 2018.

Present:  Meade, Sullivan, & Wendlandt, JJ.


Imprisonment, Grievances.  Commissioner of Correction.
    Constitutional Law, Imprisonment, Ex post facto law, Double
    jeopardy, Cruel and unusual punishment.  Due Process of
    Law, Prison regulation.  Practice, Civil, Dismissal.



    Civil action commenced in the Superior Court Department on
January 5, 2016.

    A motion to dismiss was heard by David Ricciardone, J.

    Civil action commenced in the Superior Court Department on
November 13, 2015.

---

    [1] Sean Medeiros and Lynn Lizotte.  The defendants were sued
in their official capacities.  As pertinent here, Turco was the
Commissioner of Correction, Medeiros was the Superintendent of
Massachusetts Correctional Institution at Norfolk (MCI-Norfolk),
and Lizotte was the Deputy Superintendent for classification and
treatment at MCI-Norfolk.

    [2] Owen McCants vs. Superintendent, MCI-Norfolk.

A motion to dismiss was heard by Paul D. Wilson, J.

Brian Butler, pro se.
Owen McCants, pro se.
Sheryl F. Grant for the defendants.

MEADE, J.  The plaintiffs, Brian Butler and Owen McCants, inmates supervised by the Massachusetts Department of Correction (department) and housed at MCI-Norfolk, each brought actions pro se challenging the consequences imposed on them pursuant to the department's "Program Engagement Strategy" (PES).  The defendants filed motions to dismiss both complaints, which were allowed by two different judges.  The plaintiffs appeal, alleging what we construe to be[3] various constitutional infirmities in the PES program.  We consolidated the cases for hearing in this court, and now affirm.

Background.  PES program.  In accordance with its mission to "promote public safety by managing offenders," the department established "appropriate programming in preparation for [inmates'] successful reentry into the community," such as the Sex Offender Treatment Program (SOTP).  However, the department is unable to mandate participation in such programs.  As a result, by 2012, a high percentage of offenders declined to

---

[3] Butler's complaint advances several specific constitutional claims.  McCants's complaint is less clear.  We read it, however, to include the same arguments as Butler's complaint.

attend recommended programs, spending their time in ways that did not address "the very issues that [would] decrease the likelihood that they recidivate."[4] Nevertheless, these inmates enjoyed the same privileges as "program compliant" offenders, such as single rooms, housing seniority, and institutional jobs. In response, in December of 2013, the department announced it would implement PES, an incentivization structure for program participation.[5] Under PES, privileges are awarded as incentives for inmates who voluntarily participate in programs and are

---

[4] Butler takes issue with the department's use of the word "criminogenic" in its description of PES, which provides, in pertinent part:

> "[T]he inability to mandate program participation for high to moderate risk offenders . . . has lead to many offenders refusing to address their criminogenic need areas increasing the likelihood they will recidivate soon after release."

Butler claims the term refers to offenders possessing a "criminal gene." We note that, besides being insufficient to rise to the level of appellate argument, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), Butler's claim is based on a misunderstanding. The term does not relate to genes or genetics. Rather, "criminogenic" refers to the tendency to cause crime or criminality, or, something that "contributes to the occurrence of crime." Coleman v. Schwarzenegger, 922 F. Supp. 2d 882, 973 n.68 (E.D. Cal. 2009).

[5] The department appears to have modelled PES on a similar program at the Massachusetts Treatment Center (MTC). At MTC, rather than mandating program participation, which the department is apparently unable to do, MTC rewarded offenders who participated, and "[o]ffenders who refused programming were assigned to an accountability unit without televisions, hot pots, microwaves and [with] limited job privileges." As a result, MTC's program participation increased by thirty percent.

withdrawn from inmates who refuse.  The department notified
inmates about PES by amending its institutional procedures,
hosting informational sessions for inmates, and creating
informational flyers.  PES went into effect on January 1, 2014.

Butler.  Butler was convicted in 1993 of aggravated rape,
assault and battery by means of a dangerous weapon, and
kidnapping.  He was sentenced to twenty-five to thirty years for
the aggravated rape and to concurrent eight to ten year terms on
the remaining convictions.  This court affirmed Butler's
convictions and the Supreme Judicial Court denied further
appellate review.[6]

Butler was, at all relevant times, an inmate at MCI-
Norfolk.  He became eligible to participate in SOTP classes, and
the department recommended that he do so.  In May of 2015,
Butler was informed that his failure to attend SOTP classes
would result in the imposition of PES consequences.  Butler
began attending a "preliminary" SOTP phase, but in September of
2015, he refused to participate further.  Consequently, in
accordance with PES protocol, he lost his seniority with respect
to housing.  On October 1, 2015, he was reassigned from the
single room he had occupied for nineteen years to a double room,
and his seniority date was changed to September 24, 2015.

---

[6] See Commonwealth v. Butler, 41 Mass. App. Ct. 1101, S.C.,
423 Mass. 1107 (1996).

McCants.  McCants was convicted of rape of a child by force, kidnapping, assault with intent to rape, drugging for sexual intercourse, and assault and battery by means of a dangerous weapon.  Commonwealth v. McCants, 83 Mass. App. Ct. 1129 (2013).  He was separately convicted of being an habitual offender.  This court affirmed McCants's convictions and the Supreme Judicial Court denied further appellate review.[7]  He later filed a motion for new trial, which was denied.  This court affirmed that denial.[8]

McCants was, at all relevant times, an inmate at MCI-Norfolk.  The department recommended that McCants participate in SOTP classes.  In February, 2014, McCants refused to attend the classes and subsequently lost his single cell housing assignment, institutional job, and seniority[9] with respect to housing and job placement.

Discussion.  1.  Standard of review.  "We review the allowance of a motion to dismiss de novo. . . .  We accept as true the facts alleged in the plaintiffs' complaint as well as any favorable inferences that reasonably can be drawn from

---

[7] See Commonwealth v. McCants, 65 Mass. App. Ct. 1121, S.C., 447 Mass. 1102 (2006).

[8] Commonwealth v. McCants, 83 Mass. App. Ct. 1129 (2013).

[9] On March 5, 2014, McCants was assigned a seniority date of March 5, 2014.  On July 25, 2014, without explanation in the record or in McCants's brief, he was given a new seniority date of July 22, 2014.  This does not affect our analysis.

them."  Galiastro v. Mortgage Electronic Registration Sys., 467 Mass. 160, 164 (2014).  To survive a motion to dismiss, a plaintiff must include in the complaint factual allegations that sufficiently "raise a right to relief above the speculative level."  Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting from Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

2.  Due process.  We construe some of Butler's claims to be due process claims, i.e., that PES consequences imposed on him denied him of liberty for which he should have been afforded due process.  We disagree.  "The Fourteenth Amendment [to the United States Constitution] prohibits any State from depriving a person of life, liberty, or property without due process of law." Meachum v. Fano, 427 U.S. 215, 223 (1976).  A liberty interest may arise from the Constitution itself, or it may arise from an expectation or interest created by State laws or regulations. See Wolff v. McDonnell, 418 U.S. 539, 556-558 (1974).  See also Torres v. Commissioner of Correction, 427 Mass. 611, 617, cert. denied, 525 U.S. 1017 (1998) ("Prison inmates have the protections of procedural due process only if there is an existing liberty or property interest at stake").  However, for prisoners, liberty interests are generally limited to "freedom from restraint which . . . imposes atypical and significant hardship . . . in relation to the ordinary incidents of prison

life." Sandin v. Conner, 515 U.S. 472, 484 (1995).[10] See Wilkinson v. Austin, 545 U.S. 209, 221-223 (2005).

Thus, the Sandin standard requires us to determine whether the PES "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, supra. It does not. The due process clause itself does not create a liberty interest in inmates having a room of their choice, maintaining seniority in their housing assignments, or keeping an institutional job. See id. at 484-485. See also LaChance v. Commissioner of Correction, 88 Mass. App. Ct. 507, 512 n.9 (2015) ("[L]oss of prison employment or participation in the garden program does not implicate a liberty or property interest"). Furthermore, nothing in the record suggests that returning to a more "default" housing and employment status is atypical of ordinary prison life, a necessary prerequisite for a due process claim under Sandin. Although Butler's decrease in seniority and loss of the single

---

[10] Prior to Sandin, the Court had employed a methodology for identifying State-created liberty interests that emphasized "the language of a particular [prison] regulation" instead of "the nature of the deprivation." Sandin v. Conner, supra at 481. See Hewitt v. Helms, 459 U.S. 460, 469-472 (1983). In Sandin, the Court criticized this methodology as creating a disincentive for States to promulgate procedures for prison management, and as involving the Federal courts in the day-to-day management of prisons. Sandin v. Conner, supra at 482-483. As a result, the Court abrogated the former methodology of parsing the language of particular regulations in search of mandatory directives from which a State-created liberty interest may have sprung. Id. at 483 & n.5.

room may have been a dramatic change in his circumstances, that does not elevate his conditions to "the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Sandin v. Conner, supra at 486. See Murphy v. Cruz, 52 Mass. App. Ct. 314, 319 (2001) ("The plaintiff's temporary loss of canteen privileges and attendance at the residents council's meeting are at most losses of privileges that do not give rise to a liberty interest"). Also, courts have repeatedly held that no liberty interest exists in these incentives. See, e.g., DuPont v. Saunders, 800 F.2d 8, 10 (1st Cir. 1986) (no "property or liberty rights to either obtain or maintain prison jobs"); Restucci v. Clarke, 669 F. Supp. 2d 150, 157 (D. Mass. 2009) ("There is . . . no constitutionally protected right to a single-cell").

Nor does the PES "inevitably affect the duration of [Butler's] sentence." Sandin v. Conner, supra at 487. Butler has not been impermissibly incarcerated beyond his sentence, nor was he denied parole solely as a result of PES consequences. On the contrary, Butler was denied parole on January 4, 2012 -- roughly two years prior to the PES amendment and its effective date of January 1, 2014 -- for denying his offenses, refusing to participate in SOTP, and failing to demonstrate that he was rehabilitated. He was again denied parole on January 10, 2014.

Butler is not scheduled for release until 2019.[11]  As in

Dominique v. Weld, were we to rule in favor of Butler on his

claims, "we would open the door to finding an 'atypical

restraint' whenever an inmate is moved from one situation to a

significantly harsher one that is, nonetheless, a commonplace

aspect of prison existence."  Dominique v. Weld, 73 F.3d 1156,

1160 (1st Cir. 1996).  We decline to do so.

To the extent that Butler alleges the department failed to

follow its internal procedures, stated in 103 Code Mass. Regs.

§ 420.09 (2007), in assessing his compliance with the SOTP, we

note that this section merely establishes the rules and

procedures related to classification of inmates "to determine

the status of an inmate's housing, program[,] and work

assignment within a correctional facility."  103 Code Mass.

Regs. § 420.06 (2007).  These procedures must be followed when

an inmate undergoes a periodic internal classification status

review, which must occur regularly at predetermined intervals,

and not, as here, when a PES-initiated removal of certain

privileges occurs.  Put another way, when Butler is

reclassified, these procedures will guide the department in

--------

[11] Butler does not enjoy a liberty interest in being granted parole, and he makes no such claim.  See Greenholtz v. Inmates of the Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979); Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 836 (1996).

assessing his housing, program compliance, and work assignment, but were not required under the circumstances presented here.

3. Ex post facto. Butler next claims that PES consequences are impermissible ex post facto laws. We disagree. The United States Constitution prohibits States from passing ex post facto laws. United States Constitution, art. I, § 10. These include "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Miller v. Florida, 482 U.S. 423, 429 (1987), quoting from Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798). "[T]he proper focus of [the] ex post facto inquiry is whether the relevant change 'alters the definition of criminal conduct or increases the penalty by which a crime is punishable." Dominique v. Weld, 73 F.3d at 1162, quoting from California Dept. of Corrections v. Morales, 514 U.S. 499, 506 n.3 (1995). The prohibition against ex post facto laws necessarily relates to punishment, and not "remedial" policies, such as PES. See Lyman v. Commissioner of Correction, 46 Mass. App. Ct. 202, 207 (1999). See also Opinion of the Justices to the Senate, 423 Mass. 1201, 1220 (1996) ("[L]aws[ that] rearrange rights so as to effect what is believed to be the public good[] are described compendiously as regulatory or remedial"). The stated goal of the PES program was to promote public safety by incentivizing program compliance, not to punish

those who do not comply.  PES consequences merely constitute a change in Butler's conditions, and do not "inflict a greater punishment than the law imposed for the same crime."[12]  Lyman v. Commissioner of Correction, supra at 206, citing Dominique v. Weld, supra at 1162.

4.  Double jeopardy.  To the extent that Butler alleges the PES policy violates his right against double jeopardy, the claim is without merit.  "The double jeopardy clause of the Fifth Amendment to the United States Constitution protects against a second prosecution for the same offense, either after acquittal or after conviction, and multiple punishments for the same offense."  Lyman v. Commissioner of Correction, supra at 207.  See Opinion of the Justices to the Senate, 423 Mass. at 1221-1222.  Butler's circumstances fit none of these categories.  He was not tried a second time for his offenses, and he did not receive multiple punishments for the same offenses.  Once

_____

[12] Butler also argues that PES should not be applied "retroactive[ly]" to him, because, he maintains, only the regulations in place at the time of his sentencing should be applied to him.  Assuming such a principle could be applied to internal department policies or practices, which seems doubtful, we note that PES was not applied retroactively to behavior that occurred prior to the implementation of PES.  See Koe v. Commissioner of Probation, 478 Mass. 12, 16 (2017) (a statute or regulation is retroactive only when new legal consequences attach to events completed before enactment).  In any event, were Butler to prevail on this claim, each inmate would be subject to individualized regulations according to his incarceration date.  We defer to the department's assessment that such a result would prove unworkable.  See Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 771-772 (1996).

convicted and sentenced as a sex offender, Butler was recommended to participate in SOTP to decrease the likelihood that he would recidivate. When he elected not to participate, certain privileges were rescinded as a result. This was not additional punishment for his crimes. See LaChance v. Commissioner of Correction, 88 Mass. App. Ct. at 512-513. Indeed, encouraging program participation by withholding incentives from inmates who elect not to participate in sex offender rehabilitation programs does not increase the penalty for their crimes or extend the length of their overall sentence.[13] See Dominique v. Weld, 73 F.3d at 1162, citing California Dept. of Corrections v. Morales, 514 U.S. at 506 n.3. See also 103 Department of Correction regulations (DOC) § 400 (2014) "Program Access."

5. Eighth Amendment. Butler also claims that reassigning him from a single room to a double, without any screening for

---

[13] To the extent Butler claims that the SOTP requires him to admit his guilt, and that enforcement of the PES consequences against him violates his right against self-incrimination under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, the judge properly determined that the claim is without merit. See Quegan v. Massachusetts Parole Bd., 423 Mass. at 837-838, and cases cited; Lyman v. Commissioner of Correction, 46 Mass. App. Ct. at 205 (requirement that prisoner admit that he is a sex offender as part of treatment program implicates neither Federal nor State privilege against self-incrimination). We note further that in April, 2015, the department revised its policy to provide that inmates are no longer required to admit guilt as a condition of participating in the SOTP.

compatibility (presumably with his new cellmate), violated the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights, which prohibit cruel and unusual punishments.  We disagree.

To prove a violation of the Eighth Amendment, Butler must satisfy a demanding standard.  "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citation and quotation omitted).  To prove a "conditions of confinement" claim under the Eighth Amendment, Butler must show (1) conditions "sufficiently serious" as to "result in the denial of the 'minimal civilized measure of life's necessities,'" Farmer v. Brennan, 511 U.S. 825, 832, 834 (1994), quoting from Rhodes v. Chapman, 452 U.S. 337, 347 (1981), and (2) that the department acted with "deliberate indifference" to his health or safety.[14]  Farmer v. Brennan, supra at 834.

_____

[14] In both Butler's amended complaint and on appeal, he failed to specify the basis for his otherwise unadorned Eighth Amendment claim.  In dismissing the complaint, the judge properly determined that Butler insufficiently raised a deliberate indifference claim.  For substantially the same reasons, we agree with the judge that, if construed as a deliberate indifference claim, it would nonetheless fail.  See Hudson v. Commissioner of Correction, 46 Mass. App. Ct. 538, 548

"No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual." Rhodes v. Chapman, supra at 346. Courts interpreting the Eighth Amendment and art. 26 of our Declaration of Rights take a flexible approach, deriving their "'meaning from the evolving standards of decency that mark the progress of a maturing society[,]' . . . as measured by objective standards." Michaud v. Sheriff of Essex County, 390 Mass. 523, 527-528 (1983), quoting from Libby v. Commissioner of Correction, 385 Mass. 421, 431 (1982). See Good v. Commissioner of Correction, 417 Mass. 329, 335 (1994). One such objective standard can be found in State legislation and regulations governing the department and its treatment of inmates. Michaud v. Sheriff of Essex County, supra at 529-531.

With respect to Butler's claim, 103 DOC § 400.08 (2014) addresses inmate housing cell assignments, including the use of double occupancy cells and rooms. This regulation permits double occupancy "where single cells are not . . . appropriate" and requires the department to consider a series of guidelines, which prioritize inmate safety, when authorizing such

_____

(1999), S.C., 431 Mass. 1 (2000) (insufficient facts to show "the defendants acted . . . with deliberate indifference to the claimed unlawful conditions and that those conditions constituted extreme deprivation and the unnecessary and wanton infliction of pain grossly disproportionate to the severity of his offense"). As addressed infra, we review additional grounds for rejecting Butler's Eighth Amendment claim.

assignments.[15]  In fact, from our reading of the regulation, double occupancy appears to be the norm, with single occupancy reserved for inmates who are more vulnerable or who are likely to present a risk of harm to others.  Measured by this objective standard, reassigning inmates to double occupancy cells is acceptable.  However, it is important to note that even if the guidelines or regulations were violated, or if they ceased to exist, such a circumstance would not itself constitute a "per se" Eighth Amendment or art. 26 violation given the flexibility of the standard to be applied.  See Michaud v. Sheriff of Essex County, 390 Mass. at 531.

Here, pursuant to the PES, Butler lost the privilege of living in a single cell due to his choice not to participate in the SOTP.  These facts neither demonstrate nor allow an inference that Butler has been denied "the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. at 347.  Nor can we infer from his complaint that he faces any danger in his double cell assignment.[16]  Simply put, "the

---

[15] These guidelines include an inmate's legal status, whether the inmate is a new arrival and is thus provided intensive supervision, the potential for predatory behavior between cellmates, an inmate's own perception of the potential for danger and conflicts with others, and any language barriers. 103 DOC § 400.08 (2014).

[16] Assuming Butler's claim could be construed as an argument that, categorically, sex offenders are more vulnerable than other offenders, such that they should automatically be assigned

Constitution does not mandate comfortable prisons." Id. at 349. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). At bottom, as the United States Supreme Court has held, requiring a prisoner to share his cell with another inmate or multiple other inmates does not constitute cruel and unusual punishment. Rhodes v. Chapman, 452 U.S. at 349-352.

Various other arguments the plaintiffs presented on appeal failed to cite to relevant legal authority or to their basis in the record and, as such, do not rise to the level of appellate argument. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). They are therefore deemed to be waived. See Popp v. Popp, 477 Mass. 1022, 1023 n.1 (2017).

Judgments affirmed.

---

a single room, that claim would similarly fail. Pursuant to 103 DOC § 400.08 (2014), single occupancy is permitted "when indicated," as where the department determines it necessary by its "classification system, medical diagnosis, or other professional conclusions." The 2008 version of 103 DOC § 400.07, addressing "Inmate Protection," included sexual predators as a category of inmates who "shall be" assigned single rooms, but again, only "when indicated." This provision was removed from § 400.07 in 2011. In any event, the department is duty-bound to consider each inmate's special needs and circumstances in assigning rooms to inmates. We decline to strip the department of its ability to, in its discretion, assess and utilize its resources most efficiently and effectively.